SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Jamal Wade** (A-31-21) (085198)

**Argued September 12, 2022 -- Decided November 16, 2022**

**SOLOMON, J., writing for a unanimous Court.**

In this appeal, the State concedes that police violated defendant Jamal Wade's Miranda rights by continuing a custodial interrogation after his unambiguous request for counsel. The Court considers whether it was harmless error to introduce at defendant's trial inculpatory statements he made during that continued interrogation.

After determining that defendant was a suspect in a shooting, two detectives approached defendant on the street, handcuffed him, and told him that he was under arrest for murder. Defendant was brought to headquarters for questioning.

A detective read defendant his Miranda rights and explained that "if you want to speak to us, you know you have to waive the rights." Defendant stated, "I got a lawyer," and said, "Let me talk to him." After further discussion, during which a detective told defendant that he was not under arrest, another detective asked, "Are you verbally agreeing to speak to [us] without your lawyer?" Defendant responded, "Yeah, verbally. . . . If I'm not under arrest, I don't have to talk to anybody."

The interview continued, and defendant admitted that he was depicted in a video from a store where a stolen car tied to the murder had been captured on camera on the night of the shooting. After the detectives explained that additional footage placed him at different locations throughout the night and connected him to the stolen car, defendant stated, "Now I need to call my lawyer. This just got bad." The detectives ended the interview and formally charged and booked defendant.

The State moved to admit defendant's statements from the interrogation. After a hearing, the judge ruled defendant's statements admissible, finding that defendant waived his rights. Defendant's statements were played at trial, and defendant was convicted on all counts. The Appellate Division affirmed, concluding that defendant had never exercised his right to an attorney and had knowingly, intelligently, and voluntarily waived his Miranda rights. The Court granted certification limited to the waiver issue. 249 N.J. 77 (2021).

1

**HELD:** It was error to admit defendant's statements after detectives failed to honor his invocation of the right to counsel, and that error was not harmless in light of the circumstantial nature of the evidence against defendant and his statements' capacity to undermine his credibility before the jury.

1. As all parties now agree, defendant's interrogation should have ended as soon as defendant invoked his right to counsel by stating, "I got a lawyer. . . . Let me talk to him." Defendant's subsequent statements were obtained in violation of <u>Miranda</u> and were subject to suppression. The Court thus considers whether it was harmless error to admit defendant's statements. (pp. 14-15)

2. An error is rarely found to be harmless when the State violates a defendant's right against self-incrimination. In <u>State v. Tillery</u>, any error in the admission of the defendant's statement to police was found harmless (a) in light of the "overwhelming" evidence against the defendant and (b) because the disputed statements contained "little -- if any -- incriminating evidence relevant to [the crime of conviction]." 238 N.J. 293, 320-22 (2019). In that case, admission of the statement was not capable of changing the outcome of the trial. (pp. 15-16)

3. This case is not like <u>Tillery</u> -- this is not an instance of overwhelming, direct evidence. Defendant's statements identifying himself in the store footage strengthened the State's theory of the case and the circumstantial evidence supporting it. Any doubt about whether defendant was the man on the surveillance tape was eliminated by the introduction of his statements. Further, defendant's statement -- made after police failed to honor his invocation of the right to counsel -- that he had been at the store at the time of the murder was shown to be false by the surveillance footage. This undoubtedly tarnished defendant's credibility in the eyes of the jury. In a case such as this -- where the State's theory hinges on circumstantial evidence of a defendant's location at a particular time -- a self-identifying, self-inculpatory statement that colors the defendant as a liar is not harmless beyond a reasonable doubt. While police may extract such statements through interrogation, they must do so within the confines of the law. Only a new trial, one untainted by defendant's unlawfully obtained admissions, can rectify the detectives' failure to honor defendant's <u>Miranda</u> rights. (pp. 16-18)

     **REVERSED and REMANDED for a new trial.**

**CHIEF JUSTICE RABNER; JUSTICES PATTERSON, PIERRE-LOUIS, and FASCIALE; and JUDGES FISHER and SABATINO (both temporarily assigned) join in JUSTICE SOLOMON's opinion.**

2

SUPREME COURT OF NEW JERSEY
A-31 September Term 2021
085198

State of New Jersey,

Plaintiff-Respondent,

v.

Jamal Wade, a/k/a,
Jamal Williams,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| September 12, 2022 | November 16, 2022 |

Steven E. Braun argued the cause for appellant (Bruno &
Ferraro, attorneys; Steven E. Braun and John Latoracca,
on the briefs).

Amanda G. Schwartz, Deputy Attorney General, argued
the cause for respondent (Matthew J. Platkin, Acting
Attorney General, attorney; Amanda G. Schwartz, of
counsel and on the briefs).

Surinder K. Aggarwal argued the cause for amicus curiae
Association of Criminal Defense Lawyers of New Jersey
(Stone Conroy, attorneys; Surinder K. Aggarwal, Shalom
D. Stone, and Rebekah R. Conroy, on the brief).

1

JUSTICE Solomon delivered the opinion of the Court.

In this appeal, defendant Jamal Wade challenges the introduction at his trial of inculpatory statements made to detectives during a custodial interrogation. The parties agree that police violated defendant's Miranda[1] rights by failing to honor his unambiguous request for counsel. The State nevertheless contends that defendant's inculpatory statements were harmless beyond a reasonable doubt. We conclude that the State cannot meet its heavy burden of proving that this Miranda violation was harmless beyond a reasonable doubt. Accordingly, we reverse the judgment of the Appellate Division.

Because the interrogation should have ended when defendant invoked his right to counsel, we decline to consider whether police coerced defendant's statements or whether misstatements by interrogating police officers render a Miranda waiver per se invalid.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

I.

A.

The trial court record establishes that in September 2016, Sergeant Timothy Tabor of the Paterson Police Department (PPD) responded to a report that someone had been shot in Paterson. When he arrived at the scene, Sergeant Tabor found Cosmeik Gee in his car, unresponsive and bleeding from apparent gunshot wounds to his torso. Gee later died from those wounds.

The next day, Lead PPD Detective Anthony Petrazzuolo recovered footage of the shooting from a nearby surveillance camera. This footage showed a dark-colored Audi sedan park next to Gee's car. After the Audi stopped, a man wearing a black jacket over a gray hooded sweatshirt exited the passenger seat and shot Gee several times. The shooter then re-entered the Audi and fled.

Two days later, State Police Detective Sergeant Vittorio Flora of the Auto Theft Task Force (Task Force) contacted PPD detectives with information concerning the shooting. The Task Force had been conducting an unrelated investigation into car thefts in the Paterson area. As part of that investigation, the Task Force obtained a communication data warrant authorizing installation of a GPS tracking device on a black 2012 Audi A6 sedan, which had been reported stolen. The warrant allowed instant and

continuous monitoring of the car for thirty days; the shooting occurred during that time.

After learning that a dark-colored Audi sedan had been involved in a Paterson shooting, Sergeant Flora reviewed the GPS data. The data placed the Audi at the scene of Gee's murder and then at a nearby address, where the car remained for approximately seven hours. Detectives recovered the vehicle and obtained additional surveillance footage from where the Audi had parked, which confirmed the GPS data. The footage also revealed that, after parking, the driver and passenger exited the vehicle. The driver wore a gray sweatshirt with a black line across the front and a logo on the chest. He also wore gray sweatpants and black shoes. The passenger wore a black jacket over a gray sweatshirt, gray sweatpants, and dark shoes. After getting out of the car, the passenger wiped down the exterior doorhandles.

Detectives continued to review the GPS data and found that, before the shooting, the Audi stopped near a local liquor store and did not move for approximately two hours. Detectives recovered surveillance video footage from the liquor store that showed clear images of two men walking away from the Audi and entering the store. Other cameras captured the men walking toward the Audi about two hours later. Although the footage did not show the pair enter or exit the Audi, their clothing and appearances matched those of the

4

driver and passenger shown in surveillance footage from near the murder scene.

When reviewing the liquor store footage, PPD Detective Jimmy Maldonado recognized the driver from prior interactions and identified him as defendant Jamal Wade. PPD Officer Jason English identified the passenger as codefendant Gyasi Allen, who is not a party to this appeal.

At around noon the next day, Detectives Petrazzuolo and Maldonado saw defendant standing outside a convenience store. The detectives pulled over and approached with their guns drawn. They identified themselves as PPD detectives, handcuffed defendant, and told him that he was under arrest for murder. Defendant was brought to PPD headquarters for questioning.

At PPD headquarters, the detectives brought defendant to an interview room. Detective Petrazzuolo stated, "So we told you why you're here. All right," and then administered <u>Miranda</u> warnings. Defendant verbally affirmed his understanding and signed a <u>Miranda</u> form, demonstrating that he understood his rights. As Detective Petrazzuolo began to read the waiver-of-rights section out loud, the following exchange occurred:

> Detective Petrazzuolo: So if you want to speak to us, you know you have to waive the rights. If not --
>
> Defendant: I got a lawyer, though.
>
> Detective Petrazzuolo: You have a lawyer?

Defendant:  Yeah.

Detective Petrazzuolo:  So you want a lawyer?

Defendant:  I got a lawyer.  I don't -- yeah.  Let me talk to him.

Detective Maldonado: Does he have a lawyer for something else, or you --

Defendant:  He's paid for everything.  I got a case in Delaware, a case here.  He's paid for everything.

Detective Maldonado:  Oh, okay.

Detective Petrazzuolo:  All right, so you -- you don't want to speak to us without your lawyer; is that what you're saying?

Defendant:  There's nothing to be mad at, I'm a man.

Detective Petrazzuolo:  All right, well, you're going to have to wait to speak --

Defendant:  Yeah, but I got a lawyer.  So you said I'm under arrest.  Right?

Detective Maldonado:  No, I didn't say you're under arrest.

Defendant:  You just read me my rights.

Detective Maldonado:  If you -- he hasn't been charged with anything --

. . . .

Defendant:  So then talk.  I don't need to tell you s*** if I ain't under arrest.  I know I ain't do nothing wrong.

6

Detective Petrazzuolo:  Are you . . . verbally agreeing to speak to us?

Defendant:  Yeah.  I'm a man.

Detective Petrazzuolo:  Without your lawyer here?

Defendant:  (indiscernible).  He knew you.

Detective Petrazzuolo:  Are you verbally agreeing to speak to [us] without your lawyer?

Defendant:  Yeah, verbally.  (indiscernible) I think you think I'm stupid, [be]cause I got --

Detective Maldonado:  I don't think you're stupid.  I'm just saying that you said --

Defendant:  You['re] saying the only way you need a lawyer is [if] I'm under arrest.  If I'm not under arrest, I don't have to talk to anybody.

Notwithstanding that exchange, Detective Maldonado continued with the interview, asking defendant about his whereabouts on the night of the shooting.  Defendant admitted that he was at the liquor store on the night of the shooting and identified himself in photographs taken from the liquor store footage.  This confirmed Detective Maldonado's identification of defendant as the driver.  However, defendant contended that he was at the liquor store until around 2:00 a.m. on the night in question.  After the detectives explained that additional footage placed him at different locations throughout the night and connected him to the stolen Audi, defendant stated, "Now I need to call my

lawyer. This just got bad." The detectives ended the interview and formally charged and booked defendant.

## B.

## 1.

A Passaic County grand jury returned a six-count indictment, charging defendant with second-degree unlawful possession of a weapon, first-degree purposeful or knowing murder, first-degree conspiracy to commit murder, fourth-degree certain persons not to have weapons, second-degree possession of a weapon for an unlawful purpose, and third-degree receiving stolen property.

The State moved to admit defendant's statements from the interrogation, and the court conducted a hearing to determine their admissibility. At the hearing, Detectives Petrazzuolo and Maldonado testified. Detective Petrazzuolo affirmed that he told defendant he was under arrest for murder before taking him back to PPD headquarters. Detective Petrazzuolo also explained that defendant was arrested based on probable cause, not pursuant to a warrant. Both detectives acknowledged that Detective Maldonado incorrectly told defendant that he was not under arrest when he stated, "No. I didn't say you're under arrest." Instead, Maldonado claimed that he meant to

say that defendant had not been charged with anything, but he admitted that neither detective corrected the misstatement.

The hearing judge ruled defendant's statements admissible. The judge found that defendant's age and experiences with the justice system, combined with the detectives' clear administration of Miranda warnings and the lack of coercion, supported a finding that defendant knowingly and voluntarily waived his rights. The judge dismissed Detective Maldonado's misstatement as immaterial because defendant "understood what was going on."

2.

At defendant's trial, the State played a recording of defendant's statements and used a transcript to refresh Detective Petrazzuolo's memory when testifying. The State also introduced expert testimony that, based on defendant's cell phone data, his cell phone could have been in the same location as the Audi at the time of the shooting. In addition, the State presented the surveillance footage described above and defendant's identification of himself in the liquor store footage; during closing arguments the prosecutor reminded jurors that defendant admitted he was in the video.

The jury found defendant guilty on all counts and the judge sentenced him to an aggregate forty-year term of imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

C.

Defendant appealed, arguing that his statements should have been suppressed because he did not validly waive his <u>Miranda</u> rights. According to defendant, the police never informed him of the charges he was facing, and they lied to him by stating that he was not under arrest. Accordingly, he argued that his waiver was invalid under <u>State v. A.G.D.</u>, 178 N.J. 56, 68 (2003) (holding that a <u>Miranda</u> waiver is per se invalid when police withhold the fact that a criminal complaint has been filed against the suspect or a warrant has been issued for his arrest).

The Appellate Division disagreed and affirmed in an unpublished decision, finding no error in admitting defendant's statements. Because defendant had not yet been charged and no warrant had been issued at the time of the interrogation, the Appellate Division reasoned that this case was more like <u>State v. Nyhammer</u>, 197 N.J. 383, 406-08 (2009) (police need not tell an interrogee that he is a suspect for <u>Miranda</u> purposes), than <u>State v. Vincenty</u>, 237 N.J. 122, 133-34 (2019) (reaffirming <u>A.G.D.</u>), such that the bright line of <u>A.G.D.</u> had not been crossed. Moreover, the Appellate Division explained that the totality of the circumstances "screamed out" that defendant was a suspect in the investigation.

Last, the Appellate Division concluded that defendant never exercised his right to remain silent, his right to speak to an attorney, or his right to have an attorney present during questioning "at any point" during the interview. Therefore, the Appellate Division determined that defendant had knowingly, intelligently, and voluntarily waived his Miranda rights.

We granted certification limited to whether "defendant knowingly and voluntarily waived his Miranda rights." 249 N.J. 77 (2021).

The Association of Criminal Defense Lawyers of New Jersey (ACDL) filed a motion to appear as amicus curiae, which we granted.

## II.

## A.

Defendant urges this Court to reverse the Appellate Division. He argues that the detectives violated his privilege against self-incrimination by continuing the interrogation after he invoked his right to counsel. He argues that his statement, "I got a lawyer. . . . Let me talk to him," was an invocation of the right to counsel. Defendant also contends that his waiver was not knowing or voluntary because he waived his rights in reliance on Detective Maldonado's misstatement that he had not been arrested and because he had not been informed of the charges against him. Defendant asks this Court to adopt a bright-line rule that misstatements by police -- such as Detective

11

Maldonado's statement to defendant that, "No. I didn't say you're under arrest" -- render a <u>Miranda</u> waiver per se invalid. Defendant contends that, because arrest status is an objective and discrete fact, the logic of <u>A.G.D.</u> supports the creation of a bright-line rule.

B.

The State concedes that defendant invoked his right to counsel and that the detectives should have ended the interrogation as soon as he did so, but it argues that this error was harmless. According to the State, any evidence obtained through the interrogation lacked material significance because the jury "would have heard the same evidence" through the rest of the State's case.

The State also argues that Detective Maldonado's misstatement is insufficient to invalidate defendant's waiver because the totality of the circumstances supports a finding that defendant knowingly and voluntarily waived his rights. In support, the State cites to defendant's age, prior experience with the justice system, and the fact that he was told he was under arrest prior to the interrogation. The State thus maintains that the detectives did not need to clarify the circumstances of defendant's arrest; in the State's view, defendant was on sufficient notice that he was under arrest.

12

C.

The ACDL contends that defendant unequivocally invoked his right to counsel but the detectives continued to interrogate him until he made incriminating statements. The ACDL asserts that this alone necessitates reversal. In addition, the ACDL argues that defendant did not knowingly and intelligently waive his Miranda rights. According to the ACDL, defendant misunderstood his rights and only waived them, if at all, in reliance on Detective Maldonado's misstatement regarding his arrest.

Like defendant, the ACDL urges this Court to create a bright-line rule that, when police make factually erroneous representations to a defendant regarding his arrest status and those representations cause the defendant to waive his privilege against self-incrimination, any waiver that follows should be invalid per se. The ACDL contends that this rule follows logically from A.G.D.

III.

We turn to the issue at the heart of this appeal -- was the acknowledged Miranda violation harmless? Because the answer to that question is no, we reverse and remand for a new trial.

Although not all constitutional errors call for reversal, "some may go so plainly to the integrity of the proceedings that a new trial is mandated." State

v. Macon, 57 N.J. 325, 338 (1971). "The right to counsel holds a high preferred place in our constitutional scheme because the presence of counsel is an essential safeguard to the exercise of many other valued rights." State v. Rivas, 251 N.J. 132, 136 (2022). Indeed, the right to remain silent and to counsel during custodial interrogations "are necessary 'to guarantee full effectuation of the privilege against self-incrimination.'" State v. McCloskey, 90 N.J. 18, 25 (1982) (quoting Johnson v. New Jersey, 384 U.S. 719, 729 (1966)).

Accordingly, if a suspect "states that he wants an attorney, the interrogation must cease until an attorney is present," State v. Gonzalez, 249 N.J. 612, 628 (2022) (quoting Miranda v. Arizona, 384 U.S. 436, 474 (1966)), even if the request for counsel is "ambiguous" or "equivocal," State v. Clark, 251 N.J. 266, 292 (2022). When officers do not honor such a request, the suspect's statements are "presumed involuntary" and thus inadmissible at trial, any purported waiver notwithstanding. McNeil v. Wisconsin, 501 U.S. 171, 177 (1991).

All parties now agree that defendant's interrogation should have ended as soon as defendant invoked his right to counsel by stating, "I got a lawyer. . . . Let me talk to him." It did not. Counsel was not made available, and police continued the interrogation until defendant inculpated himself.

Those statements were obtained in violation of <u>Miranda</u> and were subject to suppression. Although defendant did not raise this objection at trial, both parties now acknowledge the error in admitting his statements.

The State argues, however, that the error was harmless -- that it was not "of such a nature to have been clearly capable of producing an unjust result." <u>State v. Maltese</u>, 222 N.J. 525, 543 (2015) (quoting <u>R.</u> 2:10-2). <u>See</u> <u>State v. Jackson</u>, 243 N.J. 52, 73 (2020) (harmless error requires courts to determine whether the "error [was] 'sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached'" (alteration in original) (quoting <u>State v. Prall</u>, 231 N.J. 567, 581 (2018))).

We thus consider whether it was harmless error to admit defendant's statements, keeping in mind that we rarely find an error to be harmless when the State violates a defendant's right against self-incrimination. <u>McCloskey</u>, 90 N.J. at 31. That is not only because the right to counsel is so precious, but also because self-inculpatory statements are powerful evidence of guilt that is not easily overcome. <u>See</u> <u>State v. Carrion</u>, 249 N.J. 253, 285 (2021) ("[I]nculpatory remarks by a defendant have a tendency to resolve jurors' doubts about a defendant's guilt to his detriment." (quoting <u>McCloskey</u>, 90 N.J. at 31)). This case is no exception to that general principle.

The State argues that this case is analogous to our decision in State v. Tillery, 238 N.J. 293 (2019). In Tillery, we found harmless any error in the admission of the defendant's statement to police, emphasizing that the evidence of the defendant's guilt "was overwhelming." Id. at 310-20. In that case, the defendant was convicted of selling a handgun to a cooperating informant. Id. at 310. That informant wore a wire and recorded the defendant during the transaction; police also witnessed the defendant conduct the sale, and they recovered the handgun from the informant's vehicle. Id. at 320-21. The statements that the defendant sought to exclude, moreover, contained "little -- if any -- incriminating evidence relevant to [the crime of conviction]." Id. at 321-22. Instead, the inculpatory statements primarily concerned the defendant's ability to pay his weapon supplier, but he was convicted of selling a weapon. Id. at 321. In that context, admission of the statement was not capable of changing the outcome of the defendant's trial.

This case is not like Tillery -- this is not an instance of overwhelming, direct evidence. Defendant's statements identifying himself in the liquor store footage strengthened the State's theory of the case and the circumstantial evidence supporting it. Through a series of video clips, connected through

16

inferences,[2] the State attempted to place defendant at the scene of the murder and associate him with the Audi used in its commission. From there, the State invited the jury to conclude that defendant was the driver. Any doubt about whether defendant was the man on the surveillance tape was eliminated by the introduction of his statements.

Further, defendant's statement -- made after police failed to honor his invocation of the right to counsel -- that he had been at the liquor store at the time of the murder was shown to be false by the surveillance footage. This undoubtedly tarnished defendant's credibility in the eyes of the jury, and his recitation of events on the night of Gee's murder was disproven by his own words.

In a case such as this -- where the State's theory hinges on circumstantial evidence of a defendant's location at a particular time -- a self-identifying, self-inculpatory statement that colors the defendant as a liar is not harmless

---

[2] The Passaic County Prosecutor's Office obtained a warrant for defendant's cell phone data, which was sent to defendant's cell phone carrier. The carrier provided a call log and cell cite data, detailing which towers defendant's cell phone had communicated through on the night in question. That information was sent to the FBI's Cellular Analysis Survey Team (CAST), which determined that the cell dominant phone coverage was consistent with defendant's cell phone being present at the GPS-derived locations of the Audi. CAST also determined that the coverage of the cell site could include at least some points along the Audi's path as established by GPS data.

17

beyond a reasonable doubt. While police may extract such statements through interrogation, they must do so within the confines of the law. We are satisfied that did not happen in this case. We conclude therefore that only a new trial, one untainted by defendant's unlawfully obtained admissions, can rectify the detectives' failure to honor defendant's <u>Miranda</u> rights.

In light of our disposition of the above issues, we decline to address whether the police coerced defendant's statement or whether their misstatements rendered his <u>Miranda</u> waiver per se invalid.

## IV.

The judgment of the Appellate Division is reversed, and the matter is remanded for a new trial.

CHIEF JUSTICE RABNER; JUSTICES PATTERSON, PIERRE-LOUIS, and FASCIALE; and JUDGES FISHER and SABATINO (both temporarily assigned) join in JUSTICE SOLOMON's opinion.

18